**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN SOR, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 23 C 2401 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| TCF NATIONAL HOLDINGS INC, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Out-of-state Plaintiff Jonathan Sor brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 101). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Plaintiffs: Defendant Kathleen Long (Dkt. 202) and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt. 204). In this case, Plaintiffs' Amended Complaint alleged that the Chojnacki and Long Defendants violated 18 U.S.C.§ 1962(c), (d), while EJ Investments violated only § 1962(d). (Dkt. 101 ¶¶ 115–136).

---

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

[2] The Chojnacki Defendants include the following natural persons and entities: Marcin Chojnacki; EJ Investment Group, Inc.; and TCF National Holdings, Inc. (Dkt. 205 at 1 n.1). Another filing indicates these additional Defendants: Citypoint Illinois LLC; Mainstreet Property Management LLC. (Dkt. 220 at 1 n.1).

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 204) and Long's Motion (Dkt. 202) are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Long Defendants' Motion on Count VI. The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count V) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

## BACKGROUND

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as

inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the relevant facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker

for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

## II. The Sor Connection

With that, the Court turns to the facts that connect Sor, a California resident, to this complicated web of actors. Sor purchased two properties from TCF National Holdings, Inc.: 3068 ("Bernice I") and 3060 ("Bernice II") Bernice Ave., Lansing, IL, on December 23, 2021. (Dkt. 213 ¶ 5). The purchase price for 3060 Bernice Ave., was $525,000.00, and the purchase price for 3068 Bernice Ave., was $450,000.00. (Dkt. 213 ¶ 6). Sor initially got into real estate investing through renting out a townhouse in Southern California, which he sold for around his original purchase price 11 years later; he then flipped a duplex in Indianapolis for about twice what he paid. (Dkt. 212 ¶¶ 9–11). Around August of 2021, Sor met Randy Hui ("Hui") (a fellow real estate investor from California and a plaintiff in a related case) on a Facebook group for real estate investing; Sor was interested in investing in multifamily properties, and Hui put Sor in touch with his broker, Lori Mikosz. (Dkt. 212 ¶ 12).

Sor's first conversation with Mikosz took place shortly after Sor met Hui, in the early fall of 2021. (Dkt. 212 ¶ 14). Sor could not recall whether he initially reached out to Mikosz, or if Hui had made an introduction over email, but he was sure that the first person he talked to regarding the transactions at issue was Mikosz. (Dkt. 212 ¶ 14). Mikosz explained the Citipoint business model, essentially that it was a "one-stop shop" that would purchase the properties and manage them. (Dkt. 212 ¶ 14). Mikosz presented both Bernice I and Bernice II, and Sor saw value in the dual acquisition in that the similar area would make due diligence a little easier. (Dkt. 212 ¶ 15; Dkt. 217 ¶ 58). Sor testified that he "believes [Chojnacki] jumped in as an introductory, meeting a new client type of deal;" the Chojnacki Defendants suggest that if the interaction happened at all, it was Sor's sole interaction with Chojnacki himself prior to closing. (Dkt. 212 ¶ 29) (cleaned up). Regardless, Sor testified that Mikosz kept referencing Chojnacki in the conversation and told him the properties were owned by an "old seller" who held both properties in one LLC. (Dkt. 217 ¶¶ 56, 59; Dkt. 219 ¶¶ 56, 59).

On September 28, 2021, Sor signed a purchase agreement to purchase the Bernice I property, "as-is," for a purchase price of $450,000 and the Bernice II property, "as-is," for a purchase price of $525,000. (Dkt. 212 ¶¶ 16–17). Mikosz was Sor's designated agent and broker for both of the transactions, and Sor was represented in these transactions by Michael Brancheau, an attorney recommended by Mikosz. (Dkt. 212 ¶¶ 18–19).

Mikosz connected Sor with a lender, Weston O'Dell, to help finance the transactions. (Dkt. 212 ¶ 20). As part of the due diligence process, Sor had each of the properties appraised and inspected prior to close, receiving the inspection reports from Pro-Tech Home Inspections on October 21, 2021. (Dkt. 212 ¶¶ 20–21). Following the inspections, Sor had some follow-up questions for the inspector, and they corresponded directly about his concerns. (Dkt. 212 ¶ 20). On

October 41, 2021, Sor submitted the CitiPoint Insurance Order Form online, which apparently went to Chojnacki's inbox; in turn, he forwarded it to Mikosz and a recommended insurance agent. (Dkt. 219 ¶ 72).

The Bernice I property was appraised on December 2, 2021, for an as-is market value of $515,000—roughly $65,000 higher than Sor's agreed purchase price—and the Bernice II property was appraised for an as-is market value of $525,000, which was identical to his agreed purchase price. (Dkt. 212 ¶¶ 22–23). (As in other cases, Plaintiff contends that the document should not count as an appraisal because it refers to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.) Sor has claimed that he now believes these appraisals were incorrect, since he claims that the occupancy was misrepresented to him, which Defendants dispute; Plaintiff points to his own deposition testimony that Mikosz and her team told him that the rents were current. (Dkt. 212 ¶ 24).

There were six addendums to the purchase agreement, most having to do with delaying the close so that Sor could complete the due diligence process. (Dkt. 212 ¶ 25). Sor eventually got two separate loans approved for each property from his lender. (Dkt. 212 ¶ 25). One of the addendums added a $7,000 credit for each property as a discount for buying them both. (Dkt. 212 ¶ 25). On December 23, 2021, Sor closed on his purchases from TCF, finalizing his ownership of the Bernice I property for a final sale price of $450,000 and of the Bernice II property for a final purchase price of $525,000. (Dkt. 212 ¶¶ 26–27). He visited the properties for the first time in June 2022, a trip

on which he met with Rixer, Chojnacki, and Mikosz, his first and only visit to his properties as of his deposition. (Dkt. 212 ¶¶ 30–31).

Sor testified that he believed the seller to be a "mom-and-pop," and that TCF was their LLC. (Dkt. 212 ¶ 28). He argues that Mikosz was not the sole source of this impression despite the Defendants' contentions. Sor testified that he is "not disputing" that the units were fully leased, but is disputing that the leased tenants who were in place at time of purchase were not current, despite Mikosz' representations to the contrary. (Dkt. 212 ¶ 28). Both of the rent rolls Sor was provided by Mikosz included explicit disclaimers that "CitiPoint does not guarantee, warrant, or represent anything contained herein," though Sor contends that such language is irrelevant and immaterial when claims of racketeering and fraud are at issue. (Dkt. 212 ¶ 28).

Sor first hired Chojnacki's management company, Mainstreet Management ("Mainstreet"), after Mikosz recommended it. (Dkt. 212 ¶ 32). Sor testified that he had difficulty finding management for the properties; after about 12 months, Mainstreet shut down and Sor switched management of the properties to a different company called Ginko. (Dkt. 212 ¶ 32). After Ginko, Sor switched the management of the properties to the Alps Group until late 2024, at which point he switched to Marlo Property Management, who still manages his properties today. (Dkt. 212 ¶ 33). To this day, Sor has not sold the properties, and he testified in his deposition that he continues to collect rent each month in the amounts of: $1,800 for three bedrooms; and $1,450 for two bedrooms. (Dkt. 212 ¶ 34). He has one eviction pending, as of summer 2025, and one vacant unit. (Dkt. 212 ¶ 34).

It is undisputed that at the same time that Sor entered into his contracts using Mikosz, Chojnacki and Chase as his agents, Chojnacki, Rixer and Long were actively trying to acquire the two Bernice properties. (Dkts. 217 ¶ 60, 219 ¶ 60). On September 24, 2021, purchase contracts

were signed by Long. (Dkts. 217 ¶ 60, 219 ¶ 60). The Defendants' closing was delayed due to disagreements with the Bernice property's attorney; on October 14, for example, one of Chojnacki's employees emailed him, "I know you have a buyer on the hook, but this attorney is such a pain to deal with. She still hasn't sent us any docs or confirmed inspection." (Dkts. 217 ¶¶ 61–71, 219 ¶¶ 61–71). Sor seeks $280,000 for the difference that the Defendants pocketed between purchasing the two properties and then selling them to Sor, as well as $58,600.47 in back-end damages." (Dkt. 211, Ex. 80). His claimed "back-end" damages are related instead to "uncollected rents," "eviction costs," and an "undisclosed service charge." (Dkt. 212 ¶ 37). As throughout the related cases, Defendants take issue with the alleged back-end damages and allege that he has never provided a detailed explanation or calculation, which Plaintiff disputes without further citation to the record; Sor also referred Defendants to the same "Master Spreadsheet" that Plaintiff's counsel developed for all the related cases, as well as Sor's production of documents generally. (Dkt. 212 ¶ 38; Dkt. 211, Ex. 80).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

Sor alleges that the Chojnacki and Long Defendants violated 18 U.S.C.§ 1962(c), (d), while EJ Investments violated only § 1962(d). (Dkt. 101 ¶¶ 115–136).[3] Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on

[33] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where EJ Investments only facing allegations under § 1962(d).

the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiff paid for it. On this record, nothing indicates that Sor did not get the benefit of his bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Sor's claims about back-end damages. Defendants contend that the Sor's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. The Chojnacki Defendants' arguments about causation on this front fail in light of the apparent truth: in September and October, 2021, while Mikosz was recommending that Sor purchase the 3068 property for $450,000 and the 3060 property for $525,000, Irwin, Chojnacki, and employee Phu Nguyen were negotiating with the real "old brother sellers" to acquire the properties for themselves for much less. A jury could find that the gap between these prices indicate the enterprise was tuned into reasons why the properties would be of a much lower value than they presented to Sor. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Sor's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Mikosz' alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors

through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates.

Finally, the analysis laid out in the related cases governs the Long Defendants' contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants, not Long. (Dkt. 202-1 at 5–6). It is possible for a jury to find that Long was sufficiently engaged in the enterprise under § 1962(c) to be liable for the predicate acts despite not being as central to the encounters with Sor as Mikosz; even if the jury found that Long had nothing to do with the predicate acts, though, Long could potentially still be liable under § 1962(d), which requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added). (Long, in her Reply, argues that conspiracy was unpleaded (Dkt. 218 at 5), but the Amended Complaint appears to alternatively plead the conspiracy claim— § 1962(d)—in alleging "§ 1962(c), (d)." (Dkt. 101 ¶¶ 115–136).

Of course, it is ultimately possible for a jury to find that the evidence showing that Long's joint venture purchased the Fairview properties and subsequently sold to Plaintiff merely indicated a business relationship. (Dkt. 202-1 at 5). Yet the argument that NO reasonable jury could find for Plaintiffs on this claim is unpersuasive. Plaintiffs' evidence, though shaky at times, could sufficiently tie the Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this standard). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities could allow a jury to infer the Long Defendants knowing participated in the scheme to saddle investors with misrepresented properties in order to make a quick buck.

It is an even closer question whether Plaintiffs have sufficiently presented a case for a jury with regard to EJ Investments, which hardly features in Plaintiffs' Response. Ultimately, though, the Court declines to rule in favor of summary judgment where Plaintiffs have pieced together evidence that could support the view that EJ Investments facilitated the passing-around of real estate in order to obscure ownership and trick Plaintiffs into thinking they were getting the deal that Defendants themselves were taking. Although mere allegations of a conspiracy are insufficient to withstand a motion for summary judgment, a "conspiracy may be proven by circumstantial evidence and should not be taken from the jury as long as there is a possibility that a jury can reasonably infer from the circumstances that the required elements of conspiracy have been met." *See Chicago Miracle Temple Church, Inc. v. Fox*, 901 F.Supp. 1333, 1348 (N.D.Ill.1995).

As stated above, Plaintiffs cannot proceed on their "lost investment theory" and the Motions are granted with regard to the "front-end damages" undergirding that theory of injury. Drawing all inferences in favor of Plaintiffs, however, the Motions for Summary Judgment on Count I are otherwise denied.

## I. State-Law Claims (Counts II–VI)

Next, Chojnacki moves for summary judgment on the Shankar Plaintiffs' state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 205). Both sets of Defendants moved for summary judgment on the claim for unjust enrichment (Count VI). Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

### a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: the Chojnacki Defendants highlight that there is no evidence of any conversation between Sor and Chojnacki prior to purchase. Specifically, they note that Sor said that he might have talked to Chojnacki in his initial conversation for meeting a new client. Plaintiff makes no attempt to dispute this picture, instead generally highlighting that Sor testified that Mikosz and Chojnacki were jointly giving him the impression of things. Plaintiff does not dispute that his testimony regarding his conversation with Chojnacki was, indeed, a "meeting a new client type of deal." That is insufficient. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for

the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[4] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 101 at 28). Nor does Plaintiff meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response. (Dkt. 205 at 13-14). Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Plaintiffs do not make the requisite arguments here, and the court will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019)

---

[4] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases).

(quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

Here, a reasonable jury could find that Chojnacki's behaviors, even if often one-step-removed from direct communication with Sol (left for Mikosz to handle), was designed to induce Shankar's reliance on the inefficient and old-school seller narrative in order to secure a future profit on properties that Defendants had not yet purchased themselves. In Response, Plaintiff

points to some behavior that is perfectly legal, such as identifying longtime owners and offering them opportunities to sell. (Dkt. 214 at 22). But Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. (*Id.*) A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Shankar has presented no evidence of damages because he has not sufficiently tied damages to this part of her claim. (Dkt. 205 at 12). Yet Sor has offered some evidence on the alleged six-figure damages from unexpected repairs, unexpected code compliance, unexpected building code violations and evictions, and it is up to the jury to assess the validity, if any, of that sum. In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Sor in his dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are

actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Defendants acknowledge that Sor was arguably a customer, and thus, under the Act, Chojnacki had a duty to refrain from supplying him false information. (Dkt. 205 at 12). Instead, they argue that Chojnacki never supplied Sor were any information at all: "Sor has only recounted one interaction with Chojnacki and has testified that the substance of that conversation was a general introduction." (*Id.* at 13). Thus, the duty was never breached.

Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, declaring the arguments "without merit" and following that with an excerpt from an expert report and general references to dozens of exhibits without citation, the majority of their 56.1 statement, and zero references to case law. Plaintiff does not identify a specific misrepresenting statement from Chojnacki, instead offering general testimony that he was involved in representing Sor as his broker. Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

"Judges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002). Thus, the Court will not "address those arguments

which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)); *United States v. Anzaldi*, 2013 WL 393326, at *5 (N.D. Ill. Jan. 31, 2013) ("the Court refuses to address nonsensical arguments") (citing *Morton v. Greer,* 61 F.3d 906, 906 (7th Cir. 1995) (stating that briefs which contain no identifiable argument will be dismissed)); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith,* 910 F.2d at 1470–71 (the Court "cannot be called upon to supply legal research and organization to flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count IV.

**d. Count VI: Unjust Enrichment**

That leaves the final state-law claim: Count VI: unjust enrichment. Both sets of Defendants moved for summary judgment on Count VI. As they did in *Stafford* and *Chen*, Plaintiffs' attorneys once again incorrectly claim that Defendants' argument "relies entirely" on *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018), a case featured in the Long Defendants' brief (Dkt. 202-1 at 6), without acknowledging the case law in the Chojnacki Defendants' brief (Dkt. 205 at 15). Even so, Plaintiffs' contentions are misinformed. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*,

242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)).

To the extent that the unjust enrichment claim is premised on the ICFA, the unjust enrichment claim can survive dismissal with regard to the Chojnacki Defendants. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."). The unjust enrichment claim is barred as a tag-on to the alternative state law claims for the Chojnacki Defendants. Similarly, because there are no alternative state law claims as to Defendant Long, her Motions is granted with regard to Count VI. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). ("To the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.").

## CONCLUSION

For the above reasons, the Chojnacki Defendants' Motion for Summary Judgment [204] and the Long Defendants' Motion [202] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Long Defendants' Motion on Count VI. The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust

enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026